GARY M. RESTAINO
United States Attorney
District of Arizona
MATTHEW C. CASSELL
Assistant U.S. Attorney
ASHLEY B. CULVER
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
Email: Matthew.Cassell@usdoj.gov
          Ashley.Culver@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 15-1390-003-TUC-JGZ (EJM) |
| Plaintiff, | |
| vs. | TRIAL BRIEF |
| Abelardo Rodriguez-Arvizu, | |
| Defendant. | |

## I.    CHARGES AGAINST THE DEFENDANT

The defendant is charged via superseding indictment with one count of Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951; one count of Possession of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c); one count of Conspiracy to Possess with Intent to Distribute Marijuana, 21 U.S.C. §§ 841(a)(1) and 846; and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c).  (ECF Doc. 30.). The charges derive from a drug rip crew that operated between an unknown date to on or about October 24, 2014, outside Tucson, in the District of Arizona. The defendant's two co-defendants, Francisco Javier Caballero-Bustamante, and Jose Carlos Lemus-Veliz, previously pled guilty to Conspiracy to Interfere with Commerce by Robbery and were sentenced by the

1

Court on September 11, 2017 (Lemus-Veliz – ECF 85), and January 4, 2018 (Caballero-Bustamante – ECF 100). The defendant, Abelardo Rodriguez-Arvizu, is currently set for trial beginning June 13, 2022.

## II.   STIPULATIONS

The government expects that the parties will enter into stipulations which will be filed with this Court. The stipulations should establish the following:

A.   A Springfield Armory Model XDM .40 caliber handgun bearing serial number MG189829 was found at the scene and is a "firearm" as defined in 18 U.S.C. § 921(a)(3).

B.   A Mossberg model 500A 12-gauge shotgun bearing serial number K177904 was found at the scene and is a "firearm" as defined in 18 U.S.C. § 921(a)(3).

C.   A Romarm Cugir model CUG1K 7.62 x 39 rifle bearing serial number 1968BL2576 was found at the scene and is a "firearm" as defined in 18 U.S.C. § 921(a)(3).

D.   A Taurus Millennium PT1119 MM bearing serial number TFR 98250 was found at the scene and is a "firearm" as defined in 18 U.S.C. § 921(a)(3).

E.   A Norinco model SKS 7.62 x 39 rifle bearing serial number 07051 was found at the scene and is a "firearm" as defined in 18 U.S.C. § 921(a)(3).

## III.   STATEMENT OF FACTS

On October 24, 2014, United States Border Patrol (USBP) Agents Henry Compton and Daniel Angulo came upon fresh shoeprints of a group of people in the desert area just outside Tucson. The agents, believing this to be evidence of possible criminal activity, followed the foot sign and found a man hiding in some bushes. The man fled and a chase ensued. Both agents chased the original suspect and a second suspect, who also fled. The second suspect was dressed in body armor and was carrying a firearm, which he drew on USBP Agent Compton, who shot the suspect in the face, killing him. Law enforcement agents never captured the other subject and later identified the deceased suspect as Edgar Francisco Amaro-Lopez.

Federal Bureau of Investigation (FBI) Special Agent (SA) Michelle Terwilliger, along with other law enforcement agents, responded to the area and processed the scene, which showed signs of several individuals engaged in criminal activity. SA Terwilliger collected multiple items of evidence from the scene: a Springfield Armory Model XDM .40 caliber handgun; a Mossberg model 500A 12-gauge shotgun; a Romarm Cugir model CUG1K 7.62 x 39 rifle; a Taurus Millennium PT1119 MM; a Norinco model SKS 7.62 x 39 rifle; spent casings; two sets of body armor; knives; three cell phones; booties; three packs containing miscellaneous items; tan jacket; two black jackets; two sweatshirts; plastic water jugs; water bottles; camouflage mask; and a glove. Early on the morning of October 25, 2014, an anonymous person informed law enforcement that two people named Melvin Bustamante and Abelardo Rodriguez were in a rip crew. The tipster gave information about both individuals, including the name of Rodriguez's girlfriend and where Rodriguez resided.

The investigation picked up again on May 26, 2015, when Francisco Caballero-Bustamante was arrested by law enforcement officers in Phoenix on immigration charges. On May 27, 2015, SA Terwilliger collected two buccal swabs from Caballero-Bustamante at the Border Patrol Station in Casa Grande, Arizona. These swabs were placed into evidence and later sent by SA Terwilliger to the FBI Laboratory for DNA analysis along with the items SA Terwilliger collected from the scene and a dried blood sample collected at the autopsy of Amaro-Lopez. The FBI Laboratory received the evidence on June 26, 2015.

On July 29, 2015, a Tucson federal grand jury issued a true bill of indictment against Caballero-Bustamante for four counts, identical to those present in the superseding indictment.

On April 19, 2016, law enforcement officers collected four buccal swabs from Jose Carlos Lemus-Feliz and then sent them to the FBI Crime Laboratory. On July 21, 2016, FBI Forensic Examiner Lara Adams submitted a Laboratory Report detailing the results of the DNA testing. Through STR (short tandem repeat) analysis, Ms. Adams concluded that

Lemus-Veliz was the source of the major contributor to the DNA obtained from a plastic jug, mask, and black and grey jacket. Ms. Adams concluded that Caballero-Bustamante was the source of the major contributor to the DNA obtained from body armor and that there was strong support that he was a contributor to the DNA obtained from a plastic jug.

On August 3, 2016, SAs Tony Taylor and Michelle Terwilliger met with Conrado Navarro-Castaneda for an interview. Navarro-Castaneda told agents that he dropped off part of the group the night before Amaro-Lopez was shot, who he knew as "Calavera." Specifically, he dropped off "Grenas" (Lemus-Veliz), Juan Pedro, and "Melvin" (Caballero-Bustamante). Navarro-Castaneda said he previously dropped off the defendant, Amaro-Lopez, "Chapo," and Lemus-Veliz. He also told agents that he would be paid $100 to $200 each time.

On August 23, 2016, SAs Terwilliger and Taylor met with Karla Navarro for an interview. Karla Navarro said she was dating the defendant in 2014 and picked up the defendant and Amaro-Lopez from Amaro-Lopez's house around 7:30 or 8:00 p.m. on October 23, 2014. Navarro said the defendant had a long gun and Amaro-Lopez had a small gun. Amaro-Lopez told her where to drop them off, which was near Valencia Road and Vahalla Road. The next day the defendant called her, and she picked him up near some houses on Valencia Road and Ajo Highway. The defendant had her drop him off in the street near 32nd or 33rd streets, between 6th and 10th Avenues. She did not see the defendant again until five to six days later.

On September 7, 2016, a federal grand jury issued a true bill of indictment (superseding) against the defendant, Caballero-Bustamante, and Lemus-Veliz. The Court issued a warrant for the defendant's arrest, as Caballero-Bustamante and Lemus-Veliz were both already in custody. Both of them pled guilty to conspiracy to interfere with commerce by robbery, and this Court sentenced Lemus-Veliz on September 11, 2017, and Caballero-Bustamante on January 4, 2018.

The investigation picked up once again when the defendant was arrested on immigration charges by USBP on November 18, 2019 in Sasabe, Arizona. USBP contacted

SA Terwilliger around 6:00 p.m. on November 19, 2019, to let her know that the defendant was in custody for immigration charges and asked her if she wished to take him into custody on the warrant. SA Terwilliger acknowledged that she would take custody of the defendant and asked him to be transported to Tucson. This occurred within hours, and the defendant arrived back at Tucson Sector on November 20, 2019.

SA Terwilliger does not speak Spanish, and she believed the defendant only spoke Spanish. So, SA Terwilliger requested FBI SA Oscar Ramirez, who is bilingual and fluent in Spanish, to assist her in transporting and interviewing the defendant. SAs Ramirez and Terwilliger arrived at Tucson Sector to arrest the defendant. They then transported the defendant to the Tucson FBI Field Office to interview him. SA Terwilliger drove the vehicle and SA Ramirez sat next to the defendant. On the way, the defendant made multiple spontaneous statements about the case, not in response to any statements by either agent. Those statements included the following:

a.     The defendant asked if he would be allowed to make a telephone call;

b.     The defendant asked what his charges were;

c.     The defendant asked if this had anything to do with Edgar and then quickly added that he did not shoot Edgar and that Border Patrol did that. The defendant then stated that he did not see anything and only heard the gunshots;

d.     The defendant asked if he was going to get eight years;

e.     The defendant told the agents that he would talk to them, stating "let's do it." The agents did not engage in any conversation with the defendant when he asked these questions, only telling him that he would have an opportunity to talk once they arrived at the Field Office.

Once they arrived at the Tucson Resident Agency, SAs Terwilliger and Ramirez began their interview of the defendant at 10:38 a.m. The interview lasted 50 total minutes and was video recorded. The government intends to present an English translation of the interview, which was entirely conducted in Spanish, alongside the recording to the Court

as an exhibit. SA Ramirez read the defendant his *Miranda* rights. Over the course of the interview, the defendant admitted to the following facts:

a.    He was at the scene of the shooting and left the scene after Edgar was shot;

b.    He did not see Edgar get shot, because he was using the bathroom when it happened;

c.    He could not remember exactly when the shooting occurred, but he remembered it was cold;

d.    He identified the other members of the conspiracy, including Amaro-Lopez, Caballero-Bustamante, Lemus-Veliz, and a fifth individual he called "Chapito" which means Shorty.

e.    His wife and her brother gave them rides out to the scene of the shooting;

f.    He carried the shotgun while at the scene of the shooting, Edgar was carrying an AK-47, and "Melvin" (Caballero-Bustamante) carried a rifle;

g.    He and the other men were in the desert to steal drugs from drug traffickers, but he did not know what type of drugs or from whom they were going to steal the drugs;

The defendant also identified pictures of the other men in the rip crew, including Amaro-Lopez, "Grenas" (Lemus-Veliz), and "Melvin Abraham" (Caballero-Bustamante). Finally, the defendant consented to a DNA swab of his mouth by SAs Ramirez and Terwilliger for the purposes of collecting his buccal cells.

The buccal swabs were sent to the FBI Crime Laboratory for analysis and on March 6, 2020, Ms. Adams submitted a report of her findings. Using STR analysis, Ms. Adams concluded that the DNA profile from Item 14 (FBI Item 38 – swabbing of mouth portion of jug) originated from two individuals, and that there was very strong support for inclusion that the defendant was a contributor. Ms. Adams further concluded that the DNA profile from Item 17 (FBI Item 37 – wearer swabbing of tan jacket) originated from three individuals, and that there was very strong support for inclusion that the defendant was a contributor.

IV.     **ELEMENTS OF THE OFFENSES**

A.      **Conspiracy to Interfere with Commerce by Robbery – 18 U.S.C. § 1951**

Count One of the Indictment charges the defendant with Conspiracy to Interfere with Commerce by Robbery – 18 U.S.C. § 1951.  To establish that offense, the government must prove the following elements beyond a reasonable doubt:

First, beginning at a time unknown and ending on or about October 24, 2014, there was an agreement between two or more persons to take or obtain marijuana from or in the presence of another, against his will, by means of actual or threatened force, violence, or fear of injury; and

Second, the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it.

A conspiracy is a kind of criminal partnership – an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the government prove that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another to commit interference with commerce by robbery.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though that person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing a conspiracy exists.

The trafficking of narcotics is a federally regulated activity implicating interstate commerce. *See United States v. Kim*, 94 F.3d 1247, 1250 (9th Cir. 1996) ("Courts have determined consistently that intrastate drug activities regulated by § 841(a)(1) are tied to interstate commerce.").

**B.  Possession of a Firearm in Furtherance of a Crime of Violence - 18 U.S.C. § 924(c)(1)(A)(i)**

The defendant is charged in Count Two of the Indictment with Possession of a Firearm in Furtherance of a Crime of Violence in violation of 18 U.S.C. § 942(c)(1)(A)(i). The defendant has filed a motion to dismiss this count. The government already intended to move to dismiss this count and will do so at the Final Pretrial Conference scheduled on June 1, 2022.

**C.  Conspiracy to Possess with Intent to Distribute Marijuana - 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846**

The defendant is charged in Count Three of the Indictment with Conspiracy to Possess with Intent to Distribute Marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning on a date unknown and ending on or about October 24, 2014, there was an agreement between two or more persons to possess with the intent to distribute marijuana; and

Second, the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

"To distribute" means to deliver or transfer possession of marijuana to another person with or without any financial interest in that transaction.

As also explained in Count One, a conspiracy is a kind of criminal partnership – an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the government prove that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another to commit possession with intent to distribute marijuana.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though that person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing a conspiracy exists.

**D.  Possession of a Firearm in Furtherance of a Drug Trafficking Crime - 18 U.S.C. § 924(c)(1)(A)(i)**

The defendant is charged in Count Four of the Indictment with Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 942(c)(1)(A)(i).   In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant committed the crime of Conspiracy to Possess with Intent to Distribute Marijuana;

Second, the defendant knowingly possessed a firearm; and

Third, the defendant possessed the firearm in furtherance of the crime of conspiracy to possess with intent to distribute marijuana.

Conspiracy to Possess with Intent to Distribute Marijuana is a drug trafficking crime. 18 § U.S.C. 924(c)(2).

A person has possession of something if the person knows of its presence and has physical control of it or knows of its presence and has the power and intention to control it. More than one person can be in possession of something if each knows of its presence and has the power and intention to control it.

## V.   EVIDENTIARY ISSUES

### A.   Testimony of USBPAs Henry Compton and Daniel Angulo

The government intends to call BPAs Henry Compton and Daniel Angulo to testify about their observations and involvement with the shooting on October 24, 2014, as well as their opinions that the area where the shooting occurred was known for drug and rip crew activity.

Rule 701, Fed. R. Evid., provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determine a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Fed. R. Evid. 702.

Fed. R. Evid. 701.

"Opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion." *United States v. Skeet*, 665 F.2d 983, 985 (9th Cir. 1982). "The admissibility of lay opinion testimony under Rule 701 is committed to the sound discretion of the trial judge and his decision will be overturned only if it constitutes a clear abuse of discretion." *United States v. Gadson*, 763 F.3d 1189, 1209 (9th Cir. 2014) (quoting *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008)). "The line between lay and expert opinion depends on the basis of the opinion, not its subject matter." *United States v. Barragan*, 871 F.3d 689, 704 (9th Cir. 2017) ("An

agent's 'interpretations of ambiguous conversations based upon his direct knowledge of the investigations' are 'lay testimony.'") (quoting *United States v. Freeman*, 498 F.3d 893, 904-05 (9th Cir. 2007)); *see also United States v. Freeman*, 498 F.3d 893, 902 (9th Cir. 2007) (distinguishing between testimony based on "specialized knowledge" and testimony based on "general knowledge of the investigation").

### B.   Testimony of Conrado Navarro-Castaneda and Karla Navarro

The government intends to call Conrado Navarro-Castaneda as a witness regarding his observations before, during, and after October 24, 2014. The government expects Navarro-Castaneda to testify that he dropped off Lemus-Veliz, Caballero-Bustamante, and a man he knew as Juan Pedro on October 23, 2014. Navarro-Castaneda will also testify that he dropped off the defendant, Amaro-Lopez, an individual he knew as "Chapo," and Lemus-Veliz on a prior occasion. The government also expects Navarro-Castaneda to testify that he would be paid $100 to $200 each time he provided transportation like this.

The government also intends to call Karla Navarro as a witness regarding her observations before, during, and after October 24, 2014. Navarro will testify that she was dating the defendant at the time and picked up the defendant and Amaro-Lopez from Amaro-Lopez's house around 7:30 or 8:00 p.m. on October 23, 2014. Navarro will testify that the defendant had a long gun and Amaro-Lopez had a small gun when she saw them. Navarro will testify that she dropped them off near Valencia Road and Vahalla Road, and that she did so because Amaro-Lopez instructed her to do so. Navarro will testify that she picked the defendant up near some houses on Valencia Road and Ajo Highway on October 24, 2014, and she dropped him off near 32nd or 33rd Streets, between 6th and 10th Avenues. She did not see the defendant again until five to six days later. Navarro will testify that the defendant made certain statements to her before and after October 24, 2014, related to his actions on that date. Ms. Navarro will not testify regarding the defendant's previous drug trafficking activities.

The general rule is that relevant evidence is admissible at trial. Fed. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that

is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Relevant evidence offered to prove a defendant's guilt is, by nature, prejudicial. Rule 403's only intent is to limit unfair prejudice. Indeed,

> [r]elevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

*United States v. Hankey,* 203 F.3d 1160, 1172 (9th Cir. 2000); *see also United States v. LeMay,* 260 F.3d 1018, 1026 (9th Cir. 2001) ("All evidence introduced against a criminal defendant might be said to be prejudicial if it tends to prove the prosecution's case."). The probative value of this testimony clearly is not substantially outweighed by the danger of unfair prejudice.

**C.     Testimony of Francisco Caballero-Bustamante and Jose Lemus-Veliz**

On July 19, 2021, the government briefed the Court regarding this issue, and Caballero-Bustamante filed his responsive pleading on July 29, 2021. On January 13, 2016, Caballero-Bustamante voluntarily participated in a proffer session with law enforcement agents and the AUSA previously assigned to this case. On May 25, 2017, Caballero-Bustamante pled guilty to one of the four charged offenses pursuant to a written plea agreement and a cooperation addendum. The Court took Caballero-Bustamante's cooperation into account when it sentenced him to 98 months of incarceration, less than the 144-month sentence handed down by the Court to Lemus-Veliz.

Caballero-Bustamante has indicated, through counsel, that he does not wish to testify against the defendant, which is a clear violation of the cooperation addendum to his plea agreement. The government is aware that it cannot call a witness for the sole purpose

of impeaching him. *United States v. Buffalo*, 358 F.3d 519 (8th Cir. 2004), but given that this will be a bench trial, the government does intend to call Caballero-Bustamante to make clear his intentions. If Caballero-Bustamante refuses to answer questions posed to him, the government will be restricted from introducing his prior statements into evidence. However, if Caballero-Bustamante were to feign memory loss or make statements inconsistent with prior statements to law enforcement agents, the government is certainly entitled to impeach Caballero-Bustamante regarding his prior statements.

> Rule 613(b), Fed. R. Evid., provides:

> Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

### D.    Testimony of FBI SAs Michelle Terwilliger and Oscar Ramirez

The government intends to call FBI Special Agents Terwilliger and Ramirez as witnesses regarding their contributions to the investigation.

Agent Terwilliger was the original case agent assigned to this investigation and remains in this role now. The government intends to have SA Terwilliger sit at counsel's table during the trial. Agent Terwilliger will testify regarding items of evidence recovered from the scene, including the five firearms mentioned above, spent casings, two sets of body armor, knives, three cell phones, carpet booties, three packs containing miscellaneous items, a tan jacket, two black jackets, two sweatshirts, multiple water jugs and bottles, a camouflage mask, and a glove. Agent Terwilliger processed and took pictures of all these items in her role as case agent. In addition, Agent Terwilliger sent items off to the FBI's forensic science lab for DNA comparison testing. Finally, Agent Terwilliger was present for Agent Ramirez's interview of the defendant on November 20, 2022. Agent Terwilliger has previously testified twice in this case, once before the grand jury on September 7, 2016, and once at a motions hearing before Magistrate Judge Eric J. Markovich on June 25, 2021.

Agent Ramirez will testify regarding his observations and actions related to this investigation on November 19-20, 2019. Agent Ramirez previously testified at the motions hearing before Judge Markovich.

### E.    Issues Related to the Defendant's Statement

As briefly outlined above, the defendant provided a statement to the FBI in Tucson on November 20, 2019.  On May 27, 2021, the government filed its notice of intent to introduce confessions, admissions and statements of the defendant pursuant to Fed. R. Evid. 16.1 (ECF Doc. 137).  The above statements of the defendant were recorded and the government may play portions of the audio and video of the interview with the synced transcript.

The defendant has previously objected to the use of any portion of the defendant's statements to FBI, both in the vehicle and in the interview room. However, the defendant agrees with the government that no redactions need to be made to the statement and that if the Court orders the statements to be admissible, the entirety of the statements should be used, subject to his appeal of the issue of course.

Federal Evidence Rule 106 ("Admissions of Related Portions of a Statement") provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Rule 106 is based on considerations of (1) curing misleading impressions by taking material out of context; and (2) inadequacy of delayed repair work.  *United States v. Walker*, 652 F.2d 708, 713 (7th Cir. 1981).  The Rule does not prohibit admission of incomplete documents; it allows the opposing party to introduce the remainder without additional foundation. *United States v. Phillips*, 543 F.3d 1197, 1203 (10th Cir. 2008), cert. denied, 555 U.S. 1118 (2009).

The portions sought to be admitted must: (1) explain the admitted evidence; (2) place the admitted portion in context; (3) avoid misleading the trier of fact; and (4) ensure a fair and impartial understanding of the evidence. *United States v. Haddad*, 10 F.3d 1252,

1258-9 (7th Cir. 1993).  The burden is on the party seeking admission to demonstrate the portions of the statement to be rebutted or explained and what unadmitted portions explain or rebut. *United States v. Littwin*, 338 F.2d 141, 146 (6th Cir. 1964).  In *United States v. Liera-Morales*, 759 F.3d 1105, 111 (9th Cir. 2014), the Court recognized that some circuits apply Rule 106 to oral statements, but affirmed the exclusion of the defendant's oral exculpatory portions of his statement because the segments offered by the government were not misleading or taken out of context.

If Caballero-Bustamante does not testify, the government intends to introduce his Judgment of Conviction, a judicially noticeable document, regarding his sentence to 98 months. Normally, evidence of a co-conspirator's sentence would be clearly inadmissible. However, as he was being driven from the Border Patrol station to the FBI Resident Agency, the defendant asked Agent Ramirez if he was "going to get eight years," which is the exact amount of time Caballero-Bustamante received as his sentence from this Court. Under these specific circumstances, the probative value of this information is dramatically increased. In addition, the defendant has chosen for his trial to be a bench trial. The Court is well-situated to ignore the potential prejudice of this evidence being introduced against the defendant and consider the evidence solely for its probative value: the defendant knew how much time the Court sentenced Caballero-Bustamante to, and wanted to know if he would receive something similar. This evidence is directly relevant to whether the defendant was a member of the conspiracies alleged in Counts One and Three of the superseding indictment.

## F.    Testimony of Lara Adams

The government intends to call FBI Forensic Examiner Lara Adams as an expert witness to testify as to her opinions and interpretations of the DNA evidence in this case. The government filed its Notice of Expert Testimony on June 8, 2021 (ECF 145).

Rule 702, Fed. R. Evid., provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

15

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

An expert need not express his opinion with certainty for it to be admitted. *United States v. Collins*, 559 F.2d 561, 565 (9th Cir. 1977) (FBI photographic comparison expert testified that shoes and briefcase found in search were "most probably" the same as those depicted in bank surveillance photographs. Testimony was proper under Rule 702); *United States v. Spencer*, 439 F.2d 1047, 1049 (2nd Cir. 1971).

Rule 703, Fed. R. Evid., provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Rule 704, Fed. R. Evid., provides that testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. *United States v. Davis*, 564 F.2d 840, 845 (9th Cir. 1977).

A qualified expert may examine voluminous records and, for the convenience of the court and jury, give a summary of their contents. *United States v. Cooper*, 464 F.2d 648, 656 (10th Cir. 1972).

Rule 705, Fed. R. Evid., provides:
> Unless the court orders otherwise, an expert may state an opinion--and give the reasons for it--without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.

## VI.   ASSET FORFEITURE

The Court previously issued final orders of forfeiture after the sentencing of Lemus-Veliz on September 13, 2017 (ECF 86) and Caballero-Bustamante on January 4, 2018 (ECF 99). Through his attorney, the defendant has indicated to the government that he has no interest in any of the firearms included in the superseding indictment against him. As such, the government does not anticipate forfeiture of the firearms being an issue at the trial.

## VII.   WITNESS LIST

The United States reserves the right to add, omit, substitute, or change this order of witnesses. Presently, the United States intends to call the following witnesses as part of its case-in-chief or rebuttal.

1.   United States Border Patrol Agent Henry Compton
2.   United States Border Patrol Agent Daniel Angulo
3.   Federal Bureau of Investigation Special Agent Michelle Terwilliger
4.   Karla Navarro
5.   Conrado Navarro-Castaneda
6.   Francisco Javier Caballero-Bustamante
7.   Jose Carlos Lemus-Veliz
8.   Federal Bureau of Investigation Special Agent Oscar Ramirez
9.   Federal Bureau of Investigation Forensic Examiner Lara Adams

## VIII.   EXHIBIT LIST

The United States anticipates marking for identification, approximately 20 exhibits (no more than 25). A final exhibit list will be provided at trial. The United States anticipates the following categories of exhibits, all of which have been provided to the defendant, except for numbers 5-6.

1.   Photographs
2.   Videos
3.   Transcripts

4.    Laboratory Reports

5.    Physical Evidence Recovered from Scene of Offense

6.    Certified Court Documents

**IX.   DISCOVERY**

The United States has complied with and will continue to comply with all of its disclosure obligations.

**X.   CONCLUSION**

This brief is offered to acquaint the Court with factual and legal issues which may arise at trial. The United States requests that the Court grant it leave to submit additional memoranda should other issues emerge later.

Respectfully submitted this 30th day of May, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Matthew C. Cassell*

MATTHEW C. CASSELL
Assistant U.S. Attorney

*s/Ashley B. Culver*

ASHLEY B. CULVER
Assistant U.S. Attorney

Copy of the foregoing served electronically or by
other means this 30th day of May, 2022, to:

Francisco Leon, Esq.
Attorney for defendant